IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| JOSE LUIS YANEZ, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | Case No. 12-cv-0281-MJR-SCW |
| DR. DOUGLAS KRUSE, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

REAGAN, District Judge:

**I.**      **Introduction and Procedural History**

Plaintiff Jose Luis Yanez, currently confined at the Butner Federal Correctional Institution in North Carolina, brought this action for violations of his constitutional rights which allegedly occurred while he was at the Greenville, Illinois Federal Correctional Center (FCI Greenville).   Plaintiff filed suit pursuant to 28 U.S.C. § 1331 and *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388 (1971), asserting that Defendants were deliberately indifferent to his serious medical need relating to chronic spinal issues.

The April 2012 complaint named six Defendants:  Warden Cross, Health Service Administrator Pollman, Dr. Kruse, Physician's Assistant Gillian, Physician's Assistant Adesayna, and Regional Medical Director Paul Harvey.  (Doc. 1).  In August 2012, on threshold review of the complaint under 28 U.S.C. 1915A, the Court found that the

complaint stated one claim against Defendants Kruse and Harvey for allegedly violating the Eighth Amendment's proscription against cruel and unusual punishment by showing deliberate indifference to Plaintiff's serious medical need. (Doc. 8, p. 2). Specifically, the Court found that Kruse and Harvey had allegedly 1) persisted in ineffective forms of treatment; 2) failed to consult a specialist; 3) failed to approve Plaintiff for surgery; and 4) delayed providing Plaintiff with a wheelchair. (Doc. 8, p. 2). The Court found that Plaintiff had not adequately stated a claim against Defendants Pollman, Adesayna, Cross, or Gillian. (Doc. 8, p. 2). The Order further dismissed Plaintiff's claims based on allegations that he needed a pacemaker to address his heart disease, because it found that those allegations did not describe deliberate indifference. (Doc. 8, p. 2).

So, as of August 10, 2012, this case proceeded on a theory of deliberate indifference to the serious medical need of spinal degeneration as to Defendants Kruse and Harvey only. However, the threshold Order identified an error in Plaintiff's submission: Plaintiff's complaint was not signed. (Doc. 8, p. 3). This violates Federal Rule of Civil Procedure 11(a), which requires "Every pleading, written motion and other paper must be signed by . . . a party personally if the party is unrepresented." The Court gave Plaintiff thirty days to submit a signed copy of the complaint. (Doc. 8, p. 3). He failed to do so, and the Court struck the complaint. (Doc. 17). Plaintiff was given until September 28, 2012 to file a signed complaint. (Doc. 17). He again failed to do so, but on October 4, 2012, he filed a motion for extension of time, which included a new signed complaint. (Doc. 18).

Instead of submitting a signed copy of the original complaint, which was typewritten, Plaintiff presented a signed copy of a new handwritten complaint. (See Doc. 18-1). This handwritten complaint contained nearly identical allegations, except for the fact that it omitted Defendant Harvey from the caption. The Court conducted another threshold review, and found that, since the amended complaint contained no mention of Defendant Harvey, Plaintiff's claims against him were moot. (Doc. 26, p. 2). The Court otherwise limited Plaintiff's claims to those described in the threshold review Order, i.e., the deliberate indifference claim against Defendant Kruse for failure to treat Plaintiff's spinal issues. (Doc. 26, p. 2).

To express his disagreement with the disposition of several claims, Plaintiff filed a "Motion to Set Aside Default Judgment," seeking to amend the complaint to reinstate Defendants Cross and Harvey. (Doc. 31). The Court denied the motion because (a) no default judgment had been entered in the case, and (b) Plaintiff had not followed Local Rule 15.1 in seeking leave to amend. (Doc. 32). The Court instructed the Plaintiff to file a proper motion for leave to amend and include a copy of his proposed amended complaint no later than April 5, 2013. (Doc. 32). Although not addressed in the Court's Order, the "Motion to Set Aside Default" also attempted to reinstate the claims against Warden Cross by alleging completely frivolous claims pursuant to the Uniform Commercial Code, which of course, has no application to *Bivens* lawsuits. (Doc. 31).

On April 12, 2013, nearly a week after the Court's deadline, David Brinkley filed a motion to amend/correct the complaint on Plaintiff's behalf. Brinkley held himself out as an attorney. He is not an attorney and has a poor understanding of the law. His

3

proposed amended complaint attempted to reinstate Harvey, Cross, and Pullman, although the complaint failed to contain specific factual allegations as to any of those individuals. The Court struck the proposed amended complaint, because the Local Rules only permit members of the bar to file pleadings on behalf of others. (Doc. 34). Plaintiff was given another extension of time to amend his complaint to include Harvey. (Doc. 34).

On April 30, 2013, Brinkley filed another motion (Doc. 35), which he did not sign, although the substance of the motion indicated that he wrote it on Plaintiff's behalf. The Magistrate Judge assigned to this case struck that motion as well, but the Order was vacated by the undersigned District Judge. (Doc. 44). The undersigned disposed of the April 30, 2013 motion (Doc. 35) by mooting it and again gave Plaintiff an extension of time to file a proper motion to amend -- until July 24, 2013. (Doc. 44). No new motion seeking to amend the complaint was ever filed.

In fact, nothing further was filed in this Court until February 3, 2014,[1] when Defendant Kruse filed the summary judgment motion addressed in this Order. (Doc. 48). Kruse filed a proper notice to a pro-se plaintiff, advising Plaintiff Yanez of the consequences of failing to timely respond to the summary judgment motion. (Doc. 49). On March 17, 2014, a week *after* the deadline for responding Kruse's motion, Plaintiff filed a motion for extension of time in which he argued that according to the Old Testament, he had ninety days to respond to the pending summary judgment motion.

---

[1]     Plaintiff filed a petition for writ of mandamus in the United States Court of Appeals for the Seventh Circuit. The Seventh Circuit denied the petition on July 12, 2013. (Docs. 41, 46-47).

The Court rejected this contention and granted Plaintiff a three-week extension, making his response due on March 31, 2014.  (Doc. 51).  Construed broadly, Plaintiff's motion also sought to re-open discovery, which the Court denied.  (Doc. 51).  Plaintiff filed his response in opposition to Kruse's summary judgment motion on March 31, 2014. (Doc. 54).  The response contained another request to amend his complaint to add Harvey and Cross, discussed below.  (Doc. 54, p. 18).  Kruse filed a summary judgment reply brief on April 14, 2014.  (Doc. 57).  Kruse's summary judgment motion (Doc. 48) is ripe for disposition, and for the following reasons, the Court grants it.  One preliminary issue must be addressed first, though.

**II.    Request to Amend Complaint to Reinstate Dismissed Defendants**

Before turning to Defendant Kruse's summary judgment motion, the Court takes up Plaintiff's request to "have Dr. Harvey placed back as an [sic] defendant also . . . place Warden Cross back as a Defendant." (Doc. 54, p. 18).  A plaintiff may amend his complaint by leave of the court.  FED. R. CIV. P. 15(a)(2).  A court should give leave to file when justice so requires.  FED. R. CIV. P. 15(a)(2).  The circumstances do not warrant leave to amend here.

The Court dismissed Warden Cross on threshold review for failure to state a claim upon which relief could be granted.  Plaintiff neither named nor described Defendant Harvey in his amended complaint, so the Court dismissed Harvey on February 11, 2013.  Cognizant of the possibility that Plaintiff had omitted Harvey in error, the Court granted Plaintiff leave to refile the complaint adding Harvey.  Plaintiff did not avail himself of this opportunity.

Instead, Plaintiff filed a series of increasingly inappropriate motions, none of which could be construed as a proper amended complaint.  On July 3, 2013, the Court mooted Plaintiff's last attempt to amend his complaint and told him to ty again before July 24, 2013.  (Doc. 44).  Plaintiff failed to do so.  Allowing Plaintiff to amend the complaint now, when discovery has been closed for more than six months and the dispositive motion deadline has passed, would be highly prejudicial to Defendants. They have not had the opportunity to participate in discovery, file motions, or mount a defense to Plaintiff's claims, which remain unclear.

Amendment to add new parties also would unduly delay these proceedings. This case is nearing completion, yet Plaintiff seeks to add new Defendants who would have to conduct discovery and prepare a case from the start.  Plaintiff was given every chance to amend his complaint during the early stages of this case.  He chose not to.

Additionally, neither Plaintiff's original complaint nor his February 2013 amended complaint makes factual allegations against Harvey or Cross.  Harvey's dismissal is appropriate in this circumstance,[2] even if leaving his name off the amended complaint was merely a typographical error.  Without factual allegations against them, Harvey and Cross would have no notice of what Plaintiff was alleging.

Finally, Plaintiff indicates that he wishes to reinstate these two Defendants (Harvey and Cross), because Cross is "responsible for EVERYTHING that happens

---

[2]     The Court notes that the threshold Order itself may have contained an error. While it states that Plaintiff did state a claim against Harvey, the very next line notes the lack of "factual allegations describing specific acts or omissions by defendants Pollman, Adesayna, Cross, Gillian, or *Harvey*," and orders those Defendants dismissed without prejudice.  *See* Doc. 8, p. 2 (emphasis added).

under his watch . . . this is also correct for Regional Medical Director Harvey." (Doc. 54, p. 18).   That logic presents the theory of respondeat superior, which is generally not applicable to § 1983 or *Bivens* actions.  ***See Arnett v. Webster, 658 F.3d 742, 757 (7th Cir. 2011) ("a defendant cannot be liable under *Bivens* on the basis of respondeat superior"); Thomas v. Knight, 196 Fed. Appx. 424, 428 (7th Cir. 2006) ("There is no respondeat superior liability under § 1983….").***

Even if Plaintiff had timely amended his complaint with specific allegations against Harvey and Cross, his proposed amendment would be futile because it fails to state a claim upon which relief can be granted.   Plaintiff's attempt to add these Defendants to the case is denied.  Which leaves Kruse's summary judgment motion.

### III.   Legal Standard Governing Summary Judgment Motions

Federal Rule of Civil Procedure 56 governs motions for summary judgment. Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. ***Archdiocese of Milwaukee v. Doe, 743 F.3d 1101, 1105 (7th Cir. 2014), citing FED. R. CIV. P. 56(a).  Accord Anderson v. Donahoe, 699 F.3d 989, 994 (7th Cir. 2012).***  A genuine issue of material fact remains "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." ***Serednyj v. Beverly Healthcare, LLC, 656 F.3d 540, 547 (7th Cir. 2011), citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Accord Bunn v. Khoury Enterpr., Inc., 753 F.3d 676, 681-82 (7th Cir. 2014).***

To defeat summary judgment, a plaintiff must articulate specific facts showing that a genuine fact issue exists for trial.   "A disputed issue is 'genuine' where a

reasonable jury could render a verdict for the non-moving party, 'if the record at trial were identical to the record compiled in the summary judgment proceeding.'" *520 South Michigan Avenue Associates, Ltd., v. Unite Here Local 1,* -- F.3d --, 2014 WL 3720253, *9 (7th Cir. July 29, 2014).

In assessing a summary judgment motion, the district court views the facts in the light most favorable to, and draws all reasonable inferences in favor of, the non-movant. *Anderson,* 699 F.3d at 994; *Righi v. SMC Corp.,* 632 F.3d 404, 408 (7th Cir. 2011); *Delapaz v. Richardson,* 634 F.3d 895, 899 (7th Cir. 2011).   In the case at bar, analysis begins with an overview of the evidence properly before the Court.  Given the procedural context of this case (Defendant Kruse has moved for summary judgment), the undersigned assesses the record, resolving all factual disputes in favor of  Plaintiff (the nonmovant). *520 South Michigan Ave.,* 2014 WL 3720253, at *9; .

## IV.   <u>Analysis</u>

### A.   SUMMARY OF KEY FACTS AND EVIDENCE

Plaintiff's medical records indicated that he was diagnosed with osteoarthrosis in his back and knees in approximately 1994.  (Doc. 48-3, p. 11).  Likewise, he was diagnosed with degeneration of intervertebral discs in 1994.  (Doc. 48-3, p. 11).

Defendant Kruse, the Clinical Director at FCI Greenville, began working for FCI Greenville on January 30, 2011.  (Doc. 48-2, p. 1).  Plaintiff was already incarcerated at FCI Greenville when Kruse arrived.   Kruse was responsible for overseeing care provided to Plaintiff for roughly 16 months (i.e., from January 30, 2011 to June 14, 2012, when Plaintiff was transferred to FCI Butner).  (Doc. 48-2, p. 1).

By the time that Kruse began working at Greenville, Plaintiff was being regularly seen at the chronic care clinic for diabetes, high cholesterol, high blood pressure, a cardiac condition, gout, a spinal condition, and sleep apnea.  (Doc. 48-2, p. 1).  Kruse first saw Plaintiff on March 2, 2011.  (Doc. 48-3, p. 2).  Among other complaints, Kruse saw Plaintiff for his lumbar disc disease.  (Doc. 48-3, p. 4).  Plaintiff reported that he was diagnosed in 1985 and that he had two corrective surgeries.  (Doc. 48-3, p. 4).  He also reported trouble sleeping, low back pain which required him to use a cane, and right hip pain.  (Doc. 48-3, p. 4).  Plaintiff stated that the pain was "under the best control that can be attained."  (Doc. 48-3, p. 4).  Kruse examined Plaintiff and continued him on naproxen for his osteoarthrosis.  (Doc. 48-3, p. 7).

Plaintiff was seen at sick call by Physician's Assistant Harold Gillian on May 13, 2011 for complaints of knee and neck pain.  (Doc. 48-3, p. 16).  Gillian performed an examination and referred Plaintiff for an x-ray of his spine.  (Doc. 48-3, p. 18).  The x-ray was performed on May 27, 2011 and showed abnormalities, including "diffuse bridging osteophytes . . . through the entire lumbar spine compatible with anklyosis [sic] spondylitis."  (Doc. 48-3, p. 19).  The x-ray also showed moderate degenerative facet disease in the lower lumbar spine.  (Doc. 48-3, p. 19).  On June 1, 2011, Kruse diagnosed Plaintiff as potentially having ankylosing spondylitis.  (Doc. 48-3, pp. 12, 22).  He started Plaintiff on indomethacin in place of the naproxen.  (Doc. 48-3, p. 25).

Plaintiff followed up with Gillian on June 13, 2011.  (Doc. 48-3, p. 26).  On September 6, 2011, Plaintiff complained to Gillian that the indomethacin was not relieving his pain.  (Doc. 48-3, p. 29).  Gillian's notes indicate that he consulted with

Kruse about Plaintiff's medications for his back pain on September 7, 2011. (Doc. 48-3, p. 31). Kruse started Plaintiff on sulfasalazine in addition to the indomethacin. (Doc. 48-3, p. 31).

Kruse saw Plaintiff again on October 26, 2011, at which time Plaintiff reported that his back pain was worse. (Doc. 48-3, p. 25). Plaintiff also reported that his back locked up on him and made him unable to walk. (Doc. 48-3, p. 25). Kruse requested a rheumatology consult regarding Plaintiff's ankylosing spondylitis. (Doc. 48-3, p. 40). Kruse also noted that if Plaintiff's diagnosis of ankylosing spondylitis was confirmed, he would need to be transferred to a medical center. (Doc. 48-3, p. 40).

Approximately three days later, Plaintiff had an acute incident in his cell. (Doc. 48-3, p. 43). Nurse Kelly responded. Plaintiff reported that his knee gave out and he fell to the floor. (Doc. 48-3, p. 43). Plaintiff also reported "pain to the right side lumbar area and at present is a '15 on a 1-10 scale.'" (Doc. 48-3, p. 43). Kruse was contacted and ordered Plaintiff's indomethacin held in favor of Tylenol #3. (Doc. 48-3, p. 43). Plaintiff was also issued a wheelchair. (Doc. 48-3, p. 43).

Gillian followed up with Plaintiff on October 31, 2011 regarding his fall. Those records note that Kruse ordered an MRI of Plaintiff's spine to confirm the ankylosing spondylitis. (Doc. 48-3, pp. 46, 48). Plaintiff reported that his pain was only partially controlled by the Tylenol #3 and that he had pain leaning and walking with his cane. (Doc. 48-3, p. 46). On November 3, 2011, the health care unit renewed Plaintiff's Tylenol #3 prescription.

Plaintiff received his MRI on November 10, 2011 at Greenville Regional Hospital. (Doc. 48-3, p. 55).   The MRI showed postsurgical changes with multilevel severe degenerative changes with spinal and forminal stenosis.   (Doc. 48-3, p. 56).   It also showed fluid present in the L5/S1 disc, although the adjacent endplates appeared intact.   (Doc. 48-3, p. 56).   On December 2, 2011, the health care unit again renewed Plaintiff's prescription for Tylenol #3.   (Doc. 48-3, p. 52).

In early December 2011, Plaintiff was sent to see Dr. Stern at the Springfield Clinic.   (Doc. 48-3, pp. 59, 63).   Dr. Stern requested several tests, and the health care unit undertook to perform those laboratory and radiology requests.   (Doc. 48-3, pp. 65, 71). Plaintiff had a follow-up visit with the health care unit on December 13, 2011.   (Doc. 48-3, p. 74).   On January 4, 2012, Plaintiff's prescription for Tylenol #3 was renewed, and the records indicate that he was awaiting possible transfer due to "ankylosing spondylosis."   (Doc. 48-3, p. 79).

Dr. Stern reviewed the x-rays the health care unit had taken and determined that Plaintiff's symptoms were consistent with ankylosing spondylitis.   (Doc. 48-3, p. 89). He also wanted Plaintiff scheduled for a follow-up visit, which was done.   (Doc. 48-3, p. 89).   Plaintiff's tuberculosis test came back positive on January 24, 2012.   (Doc. 48-3, p. 92).

On March 1, 2012, Plaintiff was scheduled for a follow-up appointment with Dr. Stern, but the appointment was rescheduled when the correctional officer took Plaintiff to the wrong address.   (Doc. 48-3, p. 95).   Also on that date, Dr. Kruse submitted the paperwork to transfer Plaintiff to a medical facility, primarily due to his "atrial

fibrillation, ankylosing spondylitis and his bradycardia." (Doc. 48-3, pp. 97-101). The request also alludes to a "possible need for a pacemaker." (Doc. 48-3, p. 98).

On March 9, 2012, Plaintiff had his appointment with Dr. Stern. Stern recommended TNF alpha treatment for the spondylitis, but the treatment could not be started until Plaintiff was cleared by infectious disease for his TB. (Doc. 48-3, p. 103). Dr. Stern reported that diffuse idiopathic skeletal hyperostosis (DISH) should be added to the differential diagnosis, because Plaintiff did not have fused sacroiliac joints. (Doc. 48-3, p. 108). Dr. Stern noted that treatment for DISH would be consistent with the treatment Plaintiff was currently receiving, and TNF would be unnecessary to treat DISH. (Doc. 48-3, p. 108).

On March 12, 2012, Plaintiff was seen at the chronic care clinic for his issues. (Doc. 48-3, p. 114). Under "Cardiac," Kruse noted that the cardiologist believed that Plaintiff needed a pacemaker, but that the surgery to implant a pacemaker should be performed at the institution that takes Plaintiff after his transfer. (Doc. 48-3, p. 114).

Under "Orthopedic/Rheumatology," Kruse noted that Plaintiff had been referred to a neurosurgeon, who recommended surgery, but the surgeon would not perform the surgery until Plaintiff was cleared by an infectious disease physician. (Doc. 48-3, p. 114). Kruse made a note to inquire further about the infectious disease consult. (Doc. 48-3, p. 114).

The referral to an infectious disease specialist was approved on March 30, 2012. (Doc. 48-3, p. 118). Plaintiff was also approved to return to Dr. Stern in three months.

12

(Doc. 48-3, p. 117).   The health care unit tried to get records from Plaintiff's past TB treatment in the 1980s.  (Doc. 48-3, p. 120).

On March 27, 2012, Plaintiff's records reflect that a recent chest x-ray showed a new nodular lesion.   (Doc. 48-3, p. 126).   Kruse ordered the lesion evaluated by a pulmonologist.  (Doc. 48-3, pp. 126-127).   The health care unit continued to try to find medical records for Plaintiff's past TB treatment.  (Doc. 48-3, pp. 129-130).

On May 18, 2012, Plaintiff saw Dr. Tepper to evaluate the lesion on his lungs.  (Doc. 48-3, p. 132).  Dr. Tepper requested another CT scan.  (Doc. 48-3, p. 132).  Plaintiff was approved to follow-up with Tepper on May 30, 2012.  (Doc. 48-3, p. 135).  By June 9, 2012, Kruse's transfer request for Plaintiff had been approved, and he was given another chest x-ray to prepare for his flight and transfer to FCI Butner.  (Doc. 48-3, pp. 137-143).

### B. DELIBERATE INDIFFERENCE STANDARD

The Eighth Amendment to the United States Constitution "prohibits the government from inflicting 'cruel and unusual punishments.'"  *Munson v. Gaetz,* **673 F.3d 630, 637 (7th Cir. 2012).**  The denial of medical care may cause "pain and suffering which no one suggests would serve any penological purpose."  *Munson,* **673 F.3d at 637,** *quoting Estelle v. Gamble,* **429 U.S. 97, 103 (1976).**  Thus, prison officials violate the Eighth Amendment's prohibition against cruel and unusual punishment, if they display deliberate indifference to an inmate's serious medical needs.  *Greeno v. Daley,* **414 F.3d 645, 652–53 (7th Cir. 2005),** *quoting Estelle,* **429 U.S. at 104.**  *Accord Rodriguez v. Plymouth   Ambulance   Service,* **577   F.3d   816,   828   (7th   Cir.   2009)   ("Deliberate**

**indifference to serious medical needs of a prisoner constitutes the unnecessary and wanton infliction of pain forbidden by the Constitution.")**. A prisoner is entitled to reasonable measures to meet a substantial risk of serious harm — not to demand specific care. *Forbes v. Edgar*, **112 F.3d 262, 267 (7th Cir. 1997).**

To prevail on an Eighth Amendment challenge of constitutionally-deficient medical care, a plaintiff must satisfy a two-part test. *Arnett,*, **658 F.3d at 750.** Under the first prong, the plaintiff must show that he has an objectively serious medical need. *Arnett*, **658 F.3d at 750.** *Accord Greeno*, **414 F.3d at 653.** A medical condition need not be life-threatening to be serious; rather, it could be a condition that would result in further significant injury or unnecessary and wanton infliction of pain if not treated. *Gayton v. McCoy*, **593 F.3d 610, 620 (7th Cir. 2010).** *Accord Farmer v. Brennan*, **511 U.S. 825, 828 (1994) (violating the Eighth Amendment requires deliberate indifference to a** *substantial* **risk of** *serious* **harm);** *Munson,* **673 F.3d at 637 (inmate must show that he "suffered an objectively serious harm that presented a substantial risk to his safety").**

Only if the objective prong is satisfied is it necessary to analyze the second or subjective prong, which focuses on whether a defendant's state of mind was sufficiently culpable. *Greeno*, **414 F.3d at 652–53.** This prong requires a prisoner to show that a prison official had subjective knowledge of—and then disregarded—an excessive risk to inmate health. *Greeno*, **414 F.3d at 653.** The plaintiff need not show the defendant literally ignored his complaint, just that the defendant was aware of the serious medical condition and either knowingly or recklessly disregarded it. *Hayes v. Snyder*, **546 F.3d 516, 524 (7th Cir. 2008).**

Deliberate indifference is not negligence; it is more akin to intentional wrongdoing. *McGee v. Adams*, **721 F.3d 474, 480 (7th Cir. 2013).** The standard is criminal recklessness, and even gross negligence will not meet this standard. *Id.* **at 481**.

Additionally, a court will defer to the treatment decisions of medical professionals unless the decision is clearly outside the bounds of a minimally competent decision. *Roe v. Elyea*, **631 F.3d 843, 857 (7th Cir. 2011)**. A medical professional will only be found liable under a deliberate indifference standard if the decision "is such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible did not actually base the decision on such a judgment." *Sain v. Wood*, **512 F.3d 886, 894-95 (7th Cir. 2008)**. Medical malpractice is not deliberate indifference. *Duckworth v. Ahmad*, **532 F.3d 675, 679 (7th Cir. 2008)**.

### C.  APPLICATION

Defendant Kruse concedes that Plaintiff suffers from a serious medical need. And it is clear from the records submitted in support of the pending motion that Plaintiff's back pain is a serious medical need. The first prong of the two-part Eighth Amendment test is satisfied here – Plaintiff has an objectively, sufficiently serious medical condition. But the second prong (the subjective component) has not been met.

Construing the facts and reasonable inferences in Plaintiff's favor, the Court cannot conclude that Kruse had a sufficiently culpable state of mind (i.e., that he disregarded the risk to Plaintiff's health). To the contrary, the medical records show that Kruse was an active and conscientious participant in Plaintiff's medical care. Kruse repeatedly evaluated Plaintiff, attempted to manage his pain, prescribed medication,

referred him to specialists, and ultimately referred him to a prison with a medical center so that he could receive more appropriate care.   With this record, no reasonable jury could find Kruse deliberately indifferent in addressing Plaintiff's medical needs.

Plaintiff appears to suggest that he should have either had the surgery ten years ago, or that the surgery should have been performed during the past two years.[3]  Kruse is not liable for either of these times periods.  Kruse was only Plaintiff's treating physician from January 2011 until June 2012.  He cannot be held responsible for treatment decisions made by medical providers ten years ago.  And Plaintiff has not submitted any evidence that he was approved for surgery at that time or that any other treatment provider recommended a surgery.  He has not submitted any evidence that shows that Kruse opposed a surgery.  The record discloses many instances of Kruse seeking and obtaining approval to send Plaintiff to outside specialists while at FCI Greenville.  Likewise, Kruse cannot be held responsible for the fact that the medical staff at FCI Butner has not yet performed surgery on Plaintiff.  Kruse's responsibility ended when Plaintiff was transferred from FCI Greenville.

Plaintiff also asserts that his back surgery was delayed because a necessary surgery to insert a pacemaker was not approved.   This assertion is completely unsupported by the record.   Although a pacemaker apparently was under consideration at the end of the time Plaintiff was in Kruse's care, the record is devoid of

---

[3]     In addressing Plaintiff's arguments, the Court limits itself to discussing the claims and legal theories relevant to the case here. The Court ignores the numerous references to the uniform commercial code, admiralty law, the ADA, case law from other circuits, the standard for medical negligence, and other arguments that either have no relevance or allude to claims not present here.

evidence (or anything to support the inference) that a doctor unequivocally recommended a pacemaker, that Kruse disagreed with that recommendation, or that Kruse refused to submit the surgery for approval.  In fact, Kruse's notes indicate that he believed Plaintiff would *get* the pacemaker surgery after the transfer.  Other than Plaintiff's own statement, he has submitted no evidence that a surgery for his back was delayed due to the need for pacemaker.

There is some indication that Plaintiff's treatment for his back was delayed by a request to confirm his TB status, but that is a legitimate medical concern, and the record contains nothing to indicate that the concern was less than genuine. Moreover, this delay (had it occurred) would not constitute deliberate indifference.  Surgery is a risky procedure and hard on the cardiovascular system.   A doctor would be within the bounds of his discretion to refuse to perform surgery on these grounds.  It does not rise to the level of deliberate indifference.

Finally, Plaintiff implies that he is not in possession of his own medical records because Kruse or the Bureau of Prisons has withheld them.  (Doc. 54, p. 5).  There is no merit in this contention.   First Plaintiff has the ability to request copies of his own medical records at any time.   In fact, Plaintiff's own motion for summary judgment (Doc. 53) includes excerpts from his medical records, suggesting that he does have possession of his records.  Second, many of the records submitted in support of Kruse's motion for summary judgment were Bates-numbered, suggesting they were produced to Plaintiff prior to dispositive motions being filed.  Third, Plaintiff never brought any discovery disputes to the Court's attention during the discovery period.  Plaintiff has an

obligation to prosecute his own case, which includes developing it factually. If he had difficulties with this process, he should have brought it to the Court's attention during the discovery process.  Plaintiff cannot do nothing during discovery and then rely on a purported lack of documentation to defeat summary judgment.

**V.    <u>Conclusion</u>**

Construing the evidence in the light most favorable to Plaintiff, the Court concludes that no reasonable jury could find that Defendant Kruse acted with deliberate indifference to Plaintiff's serious medical needs.  No genuine issues of material fact remain, and Defendant is entitled to judgment as a matter of law.

Accordingly, the Court **GRANTS** Defendant Kruse's motion for summary judgment (Doc. 48).  The Clerk of Court shall enter judgment in favor of Defendant Kruse and against Plaintiff.  There being no further claims in this case, the Clerk of Court shall close the case.

IT IS SO ORDERED.

DATED September 3, 2014.

<u>**s/ Michael J. Reagan**</u>
Michael J. Reagan
United States District Judge